## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NICHOLAS KNOPICK,** | : | |
| **Plaintiff** | : | |
| | : | **NO.:** |
| **v.** | : | |
| | : | |
| **JOHN J. CONNELLY, JR.; SUSAN M.** | : | **JUDGE** |
| **KADEL; JAMES, SMITH, DURKIN &** | : | |
| **CONNELLY, L.L.P.; and** | : | **CIVIL ACTION - LAW** |
| **PHILIP A. DOWNEY,** | : | |
| **Defendants** | : | **JURY TRIAL DEMANDED** |
| | : | **(Electronically Filed)** |

## COMPLAINT

**AND NOW** comes the Plaintiff, Nicholas Knopick, by and through his counsel,

Dennis E. Boyle, Esquire, Joshua M. Autry, Esquire, and the firm of Boyle, Neblett

& Wenger, and avers as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction is founded upon 28 U.S.C. §1332 due to diversity of

citizenship because the Plaintiff is a citizen of the State of Arkansas and the

Defendants are citizens of the Commonwealth of Pennsylvania and because the

amount in controversy exceeds $75,000.00.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) as most or all Defendants reside or have a place of business within this Judicial District, and all or substantially all of the events that give rise to the claims in this action occurred within this District.

## PARTIES

3.     The Plaintiff, Nicholas ("Nick") W. Knopick, currently resides at 308 Canyon Drive, Mountain Home, AK, 72653.

4.     Defendant John J. Connelly, Jr., Esquire is a licensed legal professional with a business office located at 134 Sipe Avenue, Hummelstown, PA 17036, and is a partner of James, Smith, Durkin & Connelly, L.L.P. .  Plaintiff is asserting claims, including a professional liability claim, against this Defendant. He was during all relevant times an agent of the Connelly Firm. At all pertinent times, he held himself out as possessing training and skill as a legal professional, and devoted his professional attention to employing those skills for a fee.

5.     Defendant Susan M. Kadel, Esquire is a licensed legal professional with a business office located at 134 Sipe Avenue, Hummelstown, PA 17036, and is an associate of James, Smith, Durkin & Connelly, L.L.P. .  Plaintiff is asserting claims,

including a professional liability claim against this Defendant. She was during all relevant times an agent of the Connelly Firm. At all pertinent times, she held herself out as possessing training and skill as a legal professional, and devoted her professional attention to employing those skills for a fee.

6.     Defendant, James, Smith, Durkin & Connelly, L.L.P. ("Connelly Firm") is a partnership with its principal place of business located at 134 Sipe Avenue, Hummelstown, PA 17036.  The firm contracted to represent Mr. Knopick in his domestic matter, but its attorneys provided defective representation in violation of their obligations under the contract.

7.     Defendant, Philip A. Downey, Esquire is a licensed legal professional with a business office located at 1555 Embreeville Road, Unionville, PA 19375. Plaintiff is asserting claims, including a professional liability claim against this Defendant.  At all pertinent times, he held himself out as possessing training and skill as a legal professional, and devoted his professional attention to employing those skills for a fee. Attorney Downey contracted to represent Mr. Knopick in a legal malpractice matter against Attorneys Connelly and Kadel and their firm, but erroneously failed to file a Complaint before the running of the Statute of Limitations.

## FACTUAL BACKGROUND

**8.**     Nicholas Knopick and his wife, Darlene J. Knopick, separated on May 11, 1998, pursuant to a Separation and Property Settlement Agreement ("Separation Agreement"), drafted by Mr. Knopick's attorney at the time, Michael Hanft, Esquire. A true and correct copy of the Separation Agreement is attached hereto as Exhibit "A".

9.     The Separation Agreement constituted a final settlement for the equitable distribution of their marital property.

10.     Before entering into this agreement, Ms. Knopick was fully aware of Mr. Knopick's assets, including his possession of a substantial amount of stock.

11.     She had been fully advised of Mr. Knopick's assets by Mr. Knopick, their accountant, Charles Pegg, her attorney Carl Wess, and Mr. Knopick's attorney Michael Hanft.

12.     Under the agreement, Mr. Knopick retained title of their real estate and fully assumed all obligations on their mortgage.  In exchange for her interest in the real estate, Mr. Knopick paid Ms. Knopick the sum of $60,000.00.

13.     Additionally, each spouse retained possession of their personal property and waived any rights or interests in the other spouse's employment benefits,

4

including retirement plans, stock option purchase plans, profit sharing plans or related matters.

14.     At the time of the agreement, Mr. Knopick possessed approximately two million dollars worth of stock.  However, the stock had little to no value at that time due to the fact it was encumbered by a loan of approximately two million dollars.  Ms. Knopick was aware of both the value of the stock and the encumbrance.

15.     Each spouse further waived, released and gave up any rights against the other for alimony, support or maintenance.

16.     Mr. Knopick filed for divorce on July 30, 1999.

17.     In spite of the Separation Agreement, on August 18, 1999, Ms. Knopick sought equitable distribution of assets, alimony, alimony *pendente lite* and special relief in the Court of Common Pleas of Perry County, Pennsylvania.

18.     Ms. Knopick claimed that the Separation Agreement should be set aside, claiming that she did not know that Mr. Knopick owned the stock when she signed the Separation Agreement.

19.     On March 16, 2000, Mr. Knopick filed a Petition Seeking Enforcement of the Separation Agreement.

20.    The validity of the Separation Agreement rested on the premise of whether or not Mr. Knopick had provided a full and fair disclosure of his financial assets to Ms. Knopick before she signed the May 11, 1998 Separation Agreement.

21.    On October 31, 2001 the Plaintiff retained the Connelly Firm for representation in these proceedings, and, on February 26, 2002, Michael Hanft withdrew as counsel.  A copy of the retainer letter is attached as Exhibit "B".

22.    In the retainer letter, the Connelly Firm confirms its representation in connection with his domestic matter and other matters that he may refer to the firm for action or advice.

23.    The agreement also indicated to Mr. Knopick that Attorney Connelly would be the attorney primarily responsible for the legal work on Mr. Knopick's case.

24.    Attorney Kadel, an associate of Attorney Connelly's in the Connelly Firm, also had involvement in his case.

25.    Mr. Knopick repeatedly informed Attorneys Connelly and Kadel that he had made full and fair disclosure of all assets to Ms. Knopick prior to execution of the Separation Agreement.  He also informed Attorneys Connelly and Kadel of several witnesses who were available to testify to this fact.

26.     In early 2004, before the hearing on Mr. Knopick's Petition and before the court ruled on the validity of the Separation Agreement, Ms. Knopick offered to settle the case if Mr. Knopick would transfer three hundred thousand ($300,000) dollars worth of U.P.S. stock to her.

27.     When Mr. Knopick consulted with the Connelly Firm about this offer, Attorney Kadel assured him that the Separation Agreement was valid and that Ms. Knopick was not entitled to any more than the $60,000.00 she had already received.

28.     Additionally, Attorney Kadel informed Mr. Knopick that he had nothing to lose.   According to Attorney Kadel, if the court invalidated the Separation Agreement, all Mr. Knopick would have to pay to Ms. Knopick would be the value of his stock at the time they entered into the Separation Agreement in 1998, which would have been zero dollars due to the fact that the stock was encumbered by a loan of approximately two million dollars.

29.     Accordingly, Mr. Knopick followed Attorney Kadel's advice and rejected the offer.

30.     The Court of Common Pleas held a hearing regarding the validity of the Separation Agreement on August 2, 2004, and Attorney Kadel represented Mr. Knopick at this hearing.

7

31.     Even though Mr. Knopick had informed Attorneys Connelly and Kadel of several available witnesses who would attest to Ms. Knopick's knowledge of their financial assets at the time of the Separation Agreement, Attorney Kadel did not call any witnesses other than Mr. Knopick.  In fact, Attorneys Kadel and Connelly failed to investigate these claims by Mr. Knopick.

32.     These witnesses included, but were not limited to:

   a.     Michael Hanft, Esquire.  Attorney Hanft represented Mr. Knopick at the time of the Separation Agreement, drafted the agreement, and fully advised both parties of each other's assets.  Although Mr. Hanft has died since the August 2, 2004 hearing, he was alive at that time and available to testify.

   b.     Carl Wass, Esquire.  Attorney Wass represented Ms. Knopick when she entered into the Separation Agreement and advised her not to sign it.  He would have testified that both he and Ms. Knopick were aware of Mr. Knopick's assets, including his stock.  This would also have rebutted Ms. Knopick's testimony that Mr. Wass had minimal involvement and did not represent her.

c.      Charles and Becky Pegg. Charles Pegg was Mr. and Ms. Knopick's accountant and would testify that he fully made Ms. Knopick aware of their assets and income when he did their taxes each year.  Mr. Pegg's wife, Becky, was always present for these meetings and would have corroborated this account.  The testimony of Mr. and Mrs. Pegg would also have rebutted Ms. Knopick's testimony that Charles Pegg hid relevant portions of the tax returns from her.

33.    After the hearing, the Connelly Firm assured Mr. Knopick that it was not necessary to call witnesses to prove that he fully disclosed his assets to Ms. Knopick. Attorneys Connelly and/or Kadel also told Mr. Knopick that the hearing had gone well and that he should win.  Based upon these assurances, Mr. Knopick continued to place trust in the Connelly Firm and Attorneys Connelly and Kadel.

34.    Without the aid of the key witnesses listed in Paragraph 32 above, the Honorable Kathy A. Morrow of the Court of Common Pleas of Perry County entered an Order on July 5, 2005, holding that the Separation Agreement was invalid due to a finding that Mr. Knopick failed to provide a full and fair disclosure of his assets. A

true and correct copy of the Order is attached hereto as Exhibit "C".  In essence, Judge Morrow made a credibility determination between Mr. and Ms. Knopick.

35.    Prior to this Order, Mr. Knopick was not aware and had no reason to believe that any of his prior attorneys may have committed malpractice.

36.    In fact, Attorney Kadel expressed shock to Mr. Knopick over the phone even after the Order setting aside the Separation Agreement.  She told him that the Connelly Firm has never lost a case where the evidence was this strong in their favor. She further indicated that Judge Morrow was wrong and recommended an appeal.

37.    Mr. Knopick, at this point, continued to believe the representation of Attorney Kadel and therefore was unaware of any malpractice.

38.    Mr. Knopick filed a Notice of Appeal from the July 5, 2005, Order to the Superior Court of Pennsylvania.

39.    A Praecipe dated August 29, 2005 discharged Attorney Connelly as Mr. Knopick's attorney.  It was only after Mr. Knopick had discharged the Connelly Firm and contacted other counsel, that Mr. Knopick became aware of or discovered the malpractice from review of the matter by other counsel.

40.    After the hearing, Charles Pegg testified at another hearing on equitable distribution in Mr. Knopick's favor.

10

41.     As a result of the Court's Order invalidating the Separation Agreement, in early 2007, Mr. and Ms. Knopick agreed to settle their distribution with the following terms:

      a.     Mr. Knopick paid one million ($1,000,000.00) dollars to Ms. Knopick.

      b.     Mr. Knopick transferred eight hundred thousand ($800,000) dollars from his Individual Retirement Account ("IRA") to Ms. Knopick's IRA.

42.     Also, when the Separation Agreement was set aside, Mr. Knopick had about twenty million dollars ($20,000,000.00) worth of stock encumbered by a twenty million ($20,000,000.00) dollar loan from Wachovia.

43.     He was earning more than one million ($1,000,000.00) dollars each year in dividends from the stock (even though it was encumbered).

44.     However, when Wachovia became aware that Mr. Knopick would likely have to pay over a million dollars to Ms. Knopick, Wachovia did not renew this loan in 2006.

45.     Accordingly, Mr. Knopick was forced to sell the stock to pay off the loans, and has since lost millions of dollars each year in dividends.

46.     On July 31, 2006, Mr. Knopick contacted Philip Downey, Esquire for a review of his case, including a potential malpractice action against the Connelly Firm, Attorney Connelly and Attorney Kadel..

47.     Attorney Downey contacted Albert Momijian, Esquire, an attorney experienced in domestic related practice, who, in a September 8, 2006 letter, rendered an opinion to Attorney Downey advising of possible malpractice actions against the Connelly Firm.  This correspondence would have been sufficient to allow Attorney Downey to proceed with a malpractice action.

48.     Attorney Downey contacted Attorneys Connelly and Kadel about their malpractice, and in response, they wrote Attorney Downey a letter on November 9, 2006 blaming Mr. Knopick's failure on Attorney Hanft.  A true and correct copy of the letter is attached hereto as Exhibit "D".

49.     On March 30, 2007, Mr. Knopick entered into a contract with Philip Downey, retaining him to institute legal action against Attorneys Connelly and Kadel and the Connelly Firm, as well as "any other persons, corporations or entities deemed to be liable". A true and correct copy of the contract is attached hereto as Exhibit "E".

50.     Additionally, the contract required Attorney Downey to advise Mr. Knopick, if, at any time, Attorney Downey determined that Mr. Knopick did not have a valid claim.

51.     However, Attorney Downey never pursued any malpractice action on Mr. Knopick's behalf.

52.     In a February 28, 2008, letter to Mr. Knopick, Attorney Downey defended his lack of action by claiming that the two-year Statue of Limitations for malpractice actions began to run on the date of the August 2, 2004, hearing, even though Mr. Knopick was not aware of the malpractice prior to the July 5, 2005 Order invalidating the Separation Agreement.   A true and correct copy of the letter is attached hereto as Exhibit "F".

53.     This advice contained an inaccurate statement of the law which prejudiced Mr. Knopick and caused him harm.

54.     Under this view, Attorney Downey claimed that the March 30, 2007 contract began after the Statute of Limitations had run out.

55.     The advice also constituted an inaccurate statement concerning the Statute of Limitations which prejudiced Mr. Knopick.

## COUNT I
## Knopick v. Connelly, Kadel, & Connelly Firm

### Breach of Contract

56.     Paragraphs 1 through 55 are incorporated herein by referenced as if fully restated.

57.     When an attorney enters into a contract to provide legal services, there automatically arises a contractual duty on the part of the attorney to render those legal services in a manner that comports with the profession at large.

58.     Mr. Knopick retained Attorneys Connelly and Kadel and the Connelly Firm, for a fee to represent him in defending the validity of the Separation Agreement.

59.     In doing so, the attorneys and the firm, by implication, agreed to provide Mr. Knopick with professional services consistent with those expected of the profession at large.

60.     Attorneys Connelly and Kadel held themselves out as legal professionals and gave legal services to Mr. Knopick.

61.     They had a duty to conduct themselves as a reasonable attorney would act.

62.     Attorneys Connelly and Kadel owed Mr. Knopick a duty to possess and employ the skill and knowledge that ordinarily is employed by a professional.

63.     However, even though Mr. Knopick repeatedly informed them of witnesses that would prove that he provided a full and fair disclosure of his assets to Ms. Knopick, Attorneys Kadel and Connelly failed to investigate these witnesses or to call them at the August 2, 2004 hearing.

64.     An attorney exercising the ordinary skill and knowledge of a legal professional would have investigated and called these available witnesses.

65.     Attorneys Connelly and Kadel acted in deviation from the standard of care of a reasonable attorney and breached their duties they owed to Mr. Knopick.

66.     Attorney Connelly's and Attorney Kadel's actions were the proximate cause of Mr. Knopick's harms, were a substantial factor in bringing about his harms, and significantly increased the risk that his harms would occur.

67.     This failure was a direct cause of the July 5, 2005 Order that set aside the Separation Agreement and the unfavorable settlement that resulted from that Order.

68.     Mr. Knopick would have prevailed in the state court dispute over the Separation Agreement in the absence of professional negligence by Attorneys Connelly and Kadel.

**WHEREFORE**, Plaintiff, Nicholas Knopick, respectfully prays that this Honorable Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT II
## Knopick v. Downey

## <u>Legal Malpractice</u>

69.     Paragraphs 1 through 68 are incorporated herein by reference as if fully restated.

70.     Nicholas Knopick retained Phillip Downey to institute legal malpractice actions on his behalf.

71.     Attorney Downey held himself out as a legal professional and gave legal services to Mr. Knopick.

72.     He had a duty to conduct himself as a reasonable attorney would act.

73.     Attorney Downey owed Mr. Knopick a duty to possess and employ the skill and knowledge that ordinarily is employed by a professional.

74.     As Attorney Downey recognized, Mr. Knopick had valid malpractice claims against Attorneys Connelly and Kadel and the Connelly Firm.

75.     However, Attorney Downey improperly failed to institute any claim on Mr. Knopick's behalf.

76.     An attorney exercising the ordinary skill and knowledge of a legal professional would have filed suit on Mr. Knopick's behalf.

77.     Attorney Downey also improperly advised Mr. Knopick about the Statute of Limitations.

78.     Contrary to the statements by Attorney Downey, Pennsylvania follows the "Discovery Rule" and the Statute of Limitations does not begin to run until a plaintiff discovers, or reasonably should discover, that he or she has been injured and that his or her injury has been caused by another party's conduct.

79.     In this case, Mr. Knopick had no reason to know of his attorneys' malpractice prior to the July 5, 2005 Order that set aside the Separation Agreement, and did not actually discover the negligence until more than a month later.

80.     Prior to and after that date, he was assured by Attorneys Connelly and Kadel that they had adequately represented him at the August 2, 2004 hearing.

81.     Accordingly, Mr. Knopick was unable, despite the exercise of due diligence, to know of the injury or its cause.

82.     An attorney exercising the ordinary skill and knowledge of a legal professional would have realized that the Statute of Limitations had not run by the time Mr. Knopick contacted Mr. Downey.

83.     Attorney Downey acted in deviation from the standard of care of a reasonable attorney and breached his duties he owed to Mr. Knopick.

84.     Attorney Downey's conduct was the proximate cause of Mr. Knopick's harms, was a substantial factor in bringing about his harms, and significantly increased the risk that his harms would occur.

85.     This failure was a direct cause of the loss of Mr. Knopick's malpractice action against Attorneys Connelly and Kadel and the Connelly Firm.

86.     If a malpractice action would have been pursued, then Mr. Knopick would have recovered his loss that resulted from the Order that set aside his Separation Agreement.

**WHEREFORE**, Plaintiff, Nicholas Knopick, respectfully prays that this Honorable Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT III
## Knopick v. Downey

### Breach of Contract

87.     Paragraphs 1 through 86 are incorporated herein by reference as if fully restated.

88.     Nicholas Knopick retained Philip Downey for a fee to represent him in his malpractice action against Attorneys Connelly and Kadel and the Connelly Firm. A true and correct copy of contract is attached hereto as Exhibit "E".

89.     Attorney Downey had a duty to Mr. Knopick to abide by the requirements of the contract.

90.     However, Attorney Downey failed to institute or pursue any malpractice action on Mr. Knopick's behalf.

91.     In doing so, Attorney Downey breached his duty to Mr. Knopick under the contract.

92.     This breach was a proximate cause of the loss of Mr. Knopick's malpractice action against Attorneys Connelly and Kadel and the Connelly Firm.

93.    Additionally, the contract required Attorney Downey to advise Mr. Knopick if, at any time, Attorney Downey determined that Mr. Knopick did not have a valid claim.

94.    However, Attorney Downey failed to advise Mr. Knopick that he would not pursue a malpractice action on his behalf until the February 28, 2008 letter, which was after the two-year Statute of Limitations had run for any malpractice action against Attorneys Connelly or Kadel or the Connelly Firm.

95.    This breach was a proximate cause of the loss of Mr. Knopick's malpractice action against Attorneys Connelly and Kadel and the Connelly Firm.

96.    Accordingly, Attorney Downey breached this specific provision of the contract as well.

97.    In addition, Attorney Downey by implication agreed to provide Mr. Knopick with professional services consistent with those expected of the profession at large.

98.    However, Attorney Downey's representation of Mr. Knopick fell below this standard of care.

99.    An attorney exercising the ordinary skill and knowledge of a legal professional would have known that the Statute of Limitations did not begin to run

against Mr. Knopick at the time of the August 2004 hearing, and that, at the time Mr. Knopick retained Attorney Downey, he still had a valid and timely malpractice action against Attorneys Connelly and Kadel and the Connelly Firm.

100.   Additionally, an attorney exercising the ordinary skill and knowledge of a legal professional would have instituted and pursued malpractice actions against Attorneys Connelly and Kadel and the Connelly Firm before the expiration of the two-year Statute of Limitations on malpractice actions.

101.   Therefore, Attorney Downey failed to render those legal services in a manner that comports with the profession at large.

102.   This failure was a proximate cause of the loss of Mr. Knopick's malpractice action against Attorneys Connelly and Kadel and the Connelly Firm.

103.   If a malpractice action would have been pursued, then Mr. Knopick would have recovered his loss that resulted from the Order that set aside his Separation Agreement.

**WHEREFORE**, Plaintiff, Nicholas Knopick, respectfully prays that this Honorable Court grant the relief set forth hereinafter in the Prayer for Relief.

## **PRAYER FOR RELIEF**

Plaintiff, Nicholas Knopick, respectfully prays for judgment as follows:

A.     Compensatory damages for the loss Plaintiff suffered and continues to suffer as a result of the Order that set aside the Separation Agreement;

B.     A jury trial as to each Defendant as to each Count; and,

C.     Such  other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted,

**BOYLE, NEBLETT & WENGER**

  /s/ *Dennis E. Boyle*
**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Joshua M. Autry, Esquire**
Supreme Court I.D. No. 208459
4660 Trindle Road, Suite 200
Camp Hill, PA  17011
Phone:  (717) 737-2430
Facsimile:  (717) 737-2452
Email:  deboyle@dennisboylelaw.com
        jmautry@dennisboylelaw.com

Counsel For: Plaintiff

Dated:  July 6, 2009